1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9  LORI MANNELLA,                    )
                                     )    NO.   CV 06-469-TUC-CKJ (BPV)
10             Plaintiff,            )
                                     )
11       vs.                         )    **REPORT AND RECOMMENDATION**
                                     )
12  MICHAEL J. ASTRUE, Commissioner of)
    Social Security,                 )
13                                   )
               Defendant.            )
14  _____ )

15          Plaintiff filed this action for review of the final decision of the Commissioner for

16  Social Security pursuant to 42 U.S.C. §§ 405(g).  The case has been referred to the United

17  States Magistrate Judge pursuant to the Rules of Practice of this Court.

18          Pending before the Court is a Motion for Summary Judgment filed by Plaintiff on

19  June 11, 2007 (Doc. No.20), and a Response to Plaintiff's Motion for Summary Judgment

20  (Doc. No. 25) and a Cross-Motion for Summary Judgment (Doc. No. 26) filed by Defendant

21  on August 10, 2007.  For the following reasons, the Magistrate Judge recommends that the

22  ALJ's decision be reversed and the matter remanded for further consideration.

23  **I.     PROCEDURAL HISTORY**

24          Plaintiff filed an Application for Social Security Disability Insurance Benefits on July

25  16, 2003, alleging that she had suffered from a disability since January 15, 2000.

26  (Transcript/Administrative Record ("Tr.") 52-54, 55-64)  Plaintiff alleged she was disabled

27  due to bilateral carpal tunnel, and neck and shoulder injuries.  (Tr. 56)

28          The Social Security Administration (SSA) denied Plaintiff's Application.  (Tr. 41-45)

1    Plaintiff requested review (Tr. 37-40) and on September 16, 2005, appeared with an attorney,

2    two witnesses and a vocational expert at a hearing before Administrative Law Judge ("ALJ")

3    William J. Musseman.  (Tr. 313-351)  The ALJ found Plaintiff was not disabled.  (Tr. 11-24)

4    On July 8, 2006, Plaintiff appealed the ALJ's decision, submitting no further medical

5    evidence.  (Tr. 10, 312)  The Appeals Council denied review, making the decision of the ALJ

6    the final decision of the Commissioner.  (Tr. 6-9.)  *See* 20 C.F.R. §§ 404.981.  Plaintiff filed

7    the instant Complaint in U.S. District Court for the District of Colorado appealing the

8    Commissioner's final decision.  The matter was transferred to the U.S. District Court for the

9    District of Arizona on September 5, 2006.  (Doc. No. 9)  Plaintiff filed a Motion for

10   Summary Judgment on June 11, 2007 (Doc. No.20), and a Response (Doc. No. 25) and

11   Cross-Motion for Summary Judgment were filed by Defendant on August 10, 2007 (Doc.

12   No. 26).  No response to Defendant's Cross-Motion, or reply to the Response were filed.

13   **II.    THE COMMISSIONER'S DECISION AND EVIDENCE PRESENTED**

14   A.    Plaintiff's Education and Work History

15       Plaintiff was born on June 7, 1961  (Tr. 52)  She finished high school and about two

16   years of college with special training in the area of bartending.  (Tr. 62, 316)  Plaintiff's past

17   relevant work has been primarily in the restaurant industry; as a waitress, bartender and some

18   management, with some limited experience as a retail clerk.  (Tr. 57, 316)

19   B.    Plaintiff's Testimony

20       On September 16, 2005, Plaintiff appeared before ALJ Musseman, with an attorney

21   representative.  (Tr. 313-351)  Exhibits 1A, 1B, 1E to 5E, 1F to 16F were admitted into

22   evidence.  (Tr. 497)  Plaintiff testified that she worked primarily in the food and beverage

23   industry, as a waitress, bartender and managing at restaurants.  (Tr. 316)  Plaintiff testified

24   that when she worked at TGI Fridays in New Jersey for about four-and-a-half years,

25   beginning about fifteen years ago, her work involved "a lot of lifting and carrying trays of

26   food, and buckets full of ice, and cases of beer, and kegs of beer, and a lot of running."  (Tr.

27   317)  Plaintiff testified that she had to use her hands a lot to bartend: reaching, grasping

28   bottles, pouring into glasses, washing dishes.  (Tr. 318)

1    Plaintiff testified that after she moved to Colorado she worked as a bartender and
2    waitress, bussed tables, and was a night prep cook, with pretty much the same physical
3    requirements and duties. (Tr. 318) She worked the longest at a restaurant called "Donita's
4    Cantina," for approximately ten years, and was working there in 2000 when her shoulder
5    froze up one night and by the next day she couldn't move her shoulder. (Tr. 319-20) She
6    already had carpal tunnel syndrome prior to that, and when she saw a physician, they
7    suggested they she have carpal tunnel surgery while they did the shoulder surgeries, resulting
8    in Plaintiff undergoing four surgeries in the span of three months. (Tr. 320) The three
9    orthopedic surgeries were performed by Dr. Beam, the fourth was for a "female, unrelated
10   issue." (Tr. 320)

11   After the surgeries for carpal tunnel, Plaintiff testified that the condition worsened,
12   because the scar tissue put pressure on the median nerve, and the numbness and pain was
13   worse than it was before she had the surgery. (Tr. 328) Plaintiff's neck is chronically stiff,
14   and sometimes, she will turn her head and "something just clicks out, and then [she] can't
15   move [her] neck at all, or [her] arms or anything, [she's] almost like paralyzed for a day or
16   two until [she] lay['s] in bed and the spasm eases up." (Tr. 329) The pain in the low back
17   comes and goes, with things like driving, sitting in the car for a long time being really, really
18   painful, with a shooting pain down her left leg. (Tr. 330)

19   Plaintiff testified that even prior to the shoulder incident, she had chronic neck
20   difficulty beginning with a car accident she had around 19 years of age. (Tr. 320-21)
21   Additionally, Plaintiff experienced chronic low back pain because of all the lifting involved
22   in the jobs, and her back would go out. (Tr. 321) Plaintiff would get temporary relief from
23   a chiropractor, but then the low back would go out again. (Tr. 321)

24   Plaintiff testified that at the time in question she was 5'4" and her normal weight was
25   125 pounds. (Tr. 321-22) She testified that she weighed 110 pounds at the time of the
26   hearing. (Tr. 322) Plaintiff stated that she has trouble eating large meals because of the issue
27   where she gets overheated, a severe burning reaction with activity or eating, which is
28   apparently connected with the fibromyalgia. (Tr. 322)

1    Plaintiff attempted to go back to work after the surgeries at a t-shirt shop, but it didn't

2    work out because of the lifting and hanging things up, and reaching.  (Tr. 323-24) She also

3    tried to get a job in a low volume restaurant, primarily a coffee shop, but it was also

4    physically too much for her because it involved hanging glasses on racks overhead, and it

5    also involved lifting.  (Tr. 324) Lifting causes Plaintiff to experience a sharp pain in her

6    shoulder and grasping is difficult and her hands go numb and she drops things a lot.  (Tr.

7    324) Plaintiff agreed that this has been a constant problem since she got hurt in 2000, and

8    stated that it has consistently gotten worse.  (Tr. 324-25) Plaintiff also attempted to work at

9    a book store with a café, and was able to operate the cash register and work at the bookstore.

10   (Tr. 325) She left that employment when she moved.  (Tr. 325) Plaintiff testified, however,

11   that she did not believe that she could work a 40 hour–a-week job like that one in the

12   bookstore, or like any job, because she is too tired, because her back goes out every day and

13   she spends a lot of days just in bed, and, with the burning issue, its very difficult for her to

14   put clothes on because its too irritating against her skin.  (Tr. 325-26)

15   Plaintiff testified that she does not get out of bed approximately half of the days of the

16   month. (Tr. 326) Plaintiff testified that she had lived with Mr. Gonzales for three years, and,

17   the way they divide tasks is "primarily, I would tell him to do stuff and he would take care

18   of it for me." (Tr. 326-27)  Plaintiff sweeps occasionally, and Mr. Gonzales does a lot of the

19   cooking and cleaning around the house and takes care of the yard.  (Tr. 327)

20   Plaintiff testified that she takes a shower maybe three or four days a week, when she

21   feels good enough.  (Tr. 332) When she doesn't she stays in bed and reads all day, or goes

22   to the couch and reads, and talks on the phone to her family.  (Tr. 332) Her concentration and

23   focus isn't as good as it used to be.  (Tr. 332)

24   Plaintiff testified that she takes Ibuprofen and Darvocet for pain.  (Tr. 338)  That she

25   also tries herbal remedies because she hasn't had good luck with traditional medicine.  (Tr.

26   338) She was prescribed antidepressants, but didn't like the way they made her feel, although

27   she occasionally takes Xanax.  (Tr. 339)

28   Juan Gonzales testified that he had known Plaintiff for four years, and lived with her

1    for three years at the time of the hearing.  (Tr. 341) When asked if there was anything

2    additional to add to the testimony of Plaintiff, he stated that it was "quite a progressive thing

3    going on, especially in the last six months."  (Tr. 341) Mr. Gonzales stated that she was in

4    pain about 80 percent of the time.  (Tr. 342)

5         Nancy McCoy testified that she had known Plaintiff for about 15 years. (Tr. 343) Ms.

6    McCoy testified that Plaintiff comes into her store to check her e-mail and that she types for

7    about 30 seconds and then her hands are in pain.  (Tr. 343)  Ms. McCoy testified that

8    Plaintiff is doing her best to stay positive but that she is very depressed.  (Tr. 344) Ms.

9    McCoy testified that she can't sit in a chair for long, that she lays on the floor to talk to her

10   and that she's not comfortable sitting or standing.  (Tr. 344)

11        Charles Rissell, a vocational expert, testified in response to questions asked by the

12   ALJ.  (Tr. 345) Mr. Rissell provided the exertional and skill level involved in Plaintiff's past

13   employment as a bartender - light exertion level, SVP of 3, semi-skilled; sales clerk - light

14   exertion, SVP of 3, semi-skilled; waitress - light exertion level, SVP of 3, semi-skilled; retail

15   manager - light exertion level, SVP of 7, semi-skilled, and tarot card readings - sedentary

16   exertion level, SVP of 3, semi-skilled.

17        Mr. Rissell was presented with the following hypothetical:   "if Ms....Manella's use

18   of her hands was limited to occasional bilaterally, would that impact on the lines of endeavor

19   that you've, that she's done in the past."  (Tr. 346) Mr. Rissell responded that all of her past

20   work would have required more than occasional use, but that a definitive answer would

21   require referencing each job individually.  (Tr. 346-47.)  Mr. Rissell then refined his answer,

22   stating that "the jobs given all require at least frequent use of one form or another of the

23   hands with the exception of the tarot card reading, which is occasional."  (Tr. 347) Mr.

24   Rissell agreed that, if use of her hands is limited to occasional, she would be precluded from

25   everything except the tarot card reading.  (Tr. 347)

26        Counsel added to the hypothetical the bilateral problem of reaching, and asked if there

27   would still be jobs in the national economy.  (Tr. 348) Mr. Rissell responded that there would

28   be and gave two examples of a gate guard and an usher.  (Tr. 348) Counsel added to the

1    hypothetical which already included occasionally using hands, occasionally reaching, a

2    sitting limitation, that after between 45 minutes and an hour you had to lie on the floor to

3    recover and that you would lie on the floor for 20, 25 minutes.  (Tr. 348-49.)  Mr. Rissell

4    responded that this additional limitation would preclude all work.  (Tr. 349)  Additionally,

5    only being able to work three out of seven days would cause employment to fail.  (Tr. 349)

6         Mr. Rissell was also asked if the only limitation was pain that required that, after 45

7    minutes to an hour, Plaintiff would need to lie down and conduct business from the floor.

8    (Tr. 350)  Mr. Rissell responded that such limitation would preclude work. (Tr. 350)

9    C.    Plaintiff's Medical History

10        Plaintiff was seen by Roger Sherman, M.D., on January 15, 2000, for complaints of

11   left shoulder pain, intermittently, with acute worsening over the following night. (Tr. 89) Dr.

12   Sherman conducted physical testing on Plaintiff and took x-rays of Plaintiffs shoulder.  The

13   x-rays were consistent with Impingement Syndrome, and this was the diagnosis attributed

14   to Plaintiff's complaints.  (Tr. 89)

15        Gloria Beim, M.D., of Alpine Orthopaedics & Sports Medicine, P.C., saw Plaintiff

16   on January 31, 2000.  (Tr. 142) Dr. Beim noted that Plaintiff reported injuring her shoulder

17   on January 14, 2000, while working as a bartender. (Tr. 143) Dr. Beim reported that Plaintiff

18   was doing better with acupuncture, icing and Ibuprofen, but that she was till in a lot of pain.

19   (Tr. 143) Dr. Beim also noted that Plaintiff had a history of bilateral carpal tunnel syndrome,

20   pretty much symmetric, with the right one hurting more than the left, probably because Dr.

21   Sherman had placed Plaintiff's left arm in a sling.   (Tr. 143) Dr. Beim's diagnostic

22   impression was "Bilateral carpal tunnel syndrome and shoulder impingement rotator cuff

23   tendonopathy, possible tear and a SLAP lesion."  (Tr. 144)  Dr. Beim planned to proceed

24   with arthroscopy of the shoulder and have the left carpal tunnel release performed as she

25   would have some anesthetization/immobilization of the left arm anyway.  (Tr. 142,144-45)

26        Surgery was performed by Dr. Beim on February 18, 2000.  (Tr. 137-140) There were

27   no complications.  (Tr. 137) The procedures performed were: 1) Exam under anesthesia; 2)

28   Arthroscopic debridement of labral tears and SLAP lesion; 3) Subacromial decompression;

1    and 4) Acromioplasty on the left shoulder and an open carpal tunnel release on the left wrist.

2    (Tr. 137, 139)

3          On February 21, 2000, Plaintiff reported no night pain in her wrist, and the tingling

4    was gone.  (Tr. 135) Dr. Beim noted pain in her shoulder, although she had excellent range

5    of motion, and that, with the exception of a possible urinary tract infection, she was doing

6    well, and Dr. Beim recommended aggressive physical therapy.  (Tr. 135) Dr. Beim also

7    limited Plaintiff to no heavy lifting for 4-6 weeks.  (Tr. 135)  Dr. Beim opined that she

8    thought Plaintiff was doing very well post-op, and her plan for her shoulder was to start

9    aggressive motion.  (Tr. 134) For her wrist, Dr. Beim recommended gentle motion for the

10   next two weeks wearing the sling and that she thought she could get back to full work as

11   early as 4-6 weeks, although she told Plaintiff it might take her 2-3 months.  (Tr. 134)

12         Dr. Beim examined Plaintiff on February 28, 2000, and noted that she was doing

13   "very well" with decreasing pain.  (Tr. 132) Dr. Beim reported that Plaintiff's wrist "feels

14   great" with excellent range of motion, negative Tinels and improving strength. (Tr. 132) Dr.

15   Beim reported that the active motion of her left shoulder was poor, but she was

16   neurovascularly intact. (Tr. 132) Dr. Beim concluded that Plaintiff was doing great with the

17   wrist, and fair with the shoulder.  (Tr. 132)

18         Dr. Beim completed a Physician's Supplemental Report covering services since

19   February 28, 2000, and noted that Plaintiff could return to modified work on March 6, 2000,

20   with the temporary restriction of not using her left arm. (Tr. 133) No permanent impairment

21   was anticipated.  (Tr. 133)

22         Plaintiff was seen by Dr. Sherman on March 18, 2000 with complaints of a possible

23   infection.  (Tr. 88)

24         Dr. Beim examined Plaintiff on March 20, 2000, and noted that she had developed

25   some cellulitis in the left wrist wound, but that it was resolving with antibiotics.  (Tr. 130)

26   Dr. Beim was surprised that the shoulder therapy was taking a little longer than she would

27   expect, but believed that Plaintiff would do fine ultimately, and continued to recommend

28   aggressive therapy for the shoulder, and self physical therapy for the wrist.  (Tr. 130)

1        Dr. Beim completed a Physician's Supplemental Report covering services since

2   March 20, 2000, and noted that Plaintiff could return to modified work on March 20, 2000,

3   with the temporary restriction of no lifting or repetitive use of her left arm.  (Tr. 131) No

4   permanent impairment was anticipated. (Tr. 131)

5        Dr. Beim examined Plaintiff on April 28, 2000.  (Tr. 124) Dr. Beim reported that

6   Plaintiff stated her wrist and shoulder were feeling much better, with a huge difference from

7   pre-op for both the wrist and shoulder, and she was quite happy. (Tr. 124) Dr. Beim reported

8   that Plaintiff wanted the right carpal tunnel release because that hand continued to bother her.

9   (Tr. 124) Dr. Beim's physical exam revealed full range of motion in the wrist and shoulder,

10  no tenderness, and 5/5 rotator cuff strength in the shoulder, with full grip in the left hand.

11  (Tr. 124) Plaintiff's left wrist was negative for Tinels or Phalen's.  The right wrist was

12  positive for Phalen's and Tinels and there was mild atrophy of the inner eminence. (Tr. 124)

13  The plan was to proceed with the right carpal tunnel release. (Tr. 124)

14       Dr. Beim completed a Physician's Supplemental Report covering services since

15  February 27, 2000, and noted that Plaintiff could return to modified work on April 28, 2000,

16  with the temporary restriction of no lifting greater than five pounds, and no repetitive motion,

17  and that she would be returning for further surgery on May 9th. (Tr. 128)  No permanent

18  impairment was anticipated. (Tr. 133)

19       Surgery was performed by Dr. Beim on May 11, 2000.  (Tr. 119-20) Dr. Beim

20  performed a carpal tunnel release of the right wrist, and Plaintiff tolerated the procedure well.

21  (Tr. 119) Four days status post carpal tunnel release Plaintiff was doing well with excellent

22  range of motion and had no major complaints. (Tr. 118)

23       Dr. Beim examined Plaintiff on May 22, 2000.  Plaintiff had no complaints, and felt

24  better than pre-op as far as the numbness and tingling. (Tr. 116) Dr. Beim recommended use

25  of her right hand for daily activities, but no heavy lifting for another 3-4 weeks.  (Tr. 116)

26       Dr. Beim completed a Physician's Supplemental Report covering services since May

27  22, 2000, and noted that Plaintiff could return to modified work on May 23, 2000, with the

28  temporary restriction of no lifting with the right hand, and no lifting ten pounds or more with

1   the left hand. (Tr. 117)  No permanent impairment was anticipated. (Tr. 117)

2          Dr. Beim examined Plaintiff on June 19, 2000, and noted Plaintiff's complaints of
3   soreness in both wrists upon waking and shoulder popping in the morning. (Tr. 114) Dr.
4   Beim recommended increased activities as tolerated, although it could cause soreness and
5   achiness. (Tr. 114) Dr. Beim opined that it would be impossible for her to predict when
6   Plaintiff would be able to do full work, but that whenever Plaintiff could tolerate the soreness
7   that is generated from her work, she could return to full work. (Tr. 114) In the meantime, Dr.
8   Beim recommended modified duties, including no lifting greater than five pounds until
9   further notice. (Tr. 114)

10          Dr. Beim completed a Physician's Supplemental Report covering services since June
11   19, 2000, and noted that Plaintiff could return to modified work on June 20, 2000, with the
12   temporary restriction of no lifting greater than five pounds. (Tr. 115)  No permanent
13   impairment was anticipated. (Tr. 133)

14          Plaintiff was examined by Dr. Beim on July 17, 2000 for complaints of soreness in
15   the wrist and left shoulder. (Tr. 112) Plaintiff was mildly positive for Tinels, with near full
16   range of motion of both wrists. (Tr. 112) Plaintiff's shoulder had full range of motion
17   although her posterior capsule was a bit tight, and there were mild impingement signs. (Tr.
18   112) Dr. Beim's impression was left shoulder impingement with some posterior capsular
19   contracture in both shoulders. (Tr. 112) Plaintiff denied Dr. Beim's offer to inject Plaintiff's
20   shoulder with Cortisone, which Dr. Beim believed would help the scar more than anything.
21   (Tr. 112)

22          Dr. Beim completed a Physician's Supplemental Report covering services since July
23   17, 2000, and noted that Plaintiff could return to modified work on July 17, 2000, with the
24   temporary restriction of no repetitive shoulder or wrist motions, and no lifting greater than
25   five pounds. (Tr. 113) No permanent impairment was anticipated. (Tr. 113)

26          Plaintiff was treated at Red Lady Spine and Sports Physical Therapy from March 17,
27   2000 to August 21, 2000 for impingement of her left shoulder and s/p decompression. (Tr.
28   94-99)  Plaintiff was assessed on August 21, 2000: "Pt's nervous system seems to be

1    hyperactive (hypersensitive) which appears to be contributing to hand/wrist symptoms.  Pt's

2    c/s musculature is very hyperactive/hypersensitive which also appears to be contributing to

3    many of pt's symptoms.  Pt's posture is improving but is still poor to fair [with] forward

4    head/shoulders.     Improved  posture/alignment  should  help  [with]  all  symptoms.

5    Recommended 4-6 more weeks of P.T. at 1-2x per week."  (Tr. 94)

6        Dr. Beim examined Plaintiff on August 28, 2000.  Plaintiff reported that she was still

7    having shoulder pain, although overall it was better.  (Tr. 109) Plaintiff reported stiffness in

8    the morning with certain activities that caused a zinging pain all of a sudden in the shoulder.

9    (Tr. 109) Plaintiff reported an occasional electric type sensation from the scar reaching into

10   the palm of the left hand, and complained of occasional numbness of the entire right hand,

11   and said that the left hand falls asleep on her at times.  (Tr. 109) Dr. Beim offered speculation

12   as to why Plaintiff was still experiencing difficulties in both the wrist and shoulder, although

13   Dr. Beim opined that she could not figure out why she was not 100% better, and that it was

14   a little bit of a mystery that she continued to have pain.  (Tr. 109) Dr. Beim referred Plaintiff

15   to a neurologist to perform a nerve compression and a possible MRI scan of the C-spine.  (Tr.

16   110) Dr. Beim recommended continued desensitization and massage to the wrist area, and

17   reassured Plaintiff that she should not have a long-term problem with this.  (Tr. 110) Dr.

18   Beim recommended giving the shoulder more time, and then performing an MRI to see if

19   there was something unusual in the shoulder, such as a bone tumor, causing the pain.  (Tr.

20   110)

21       Dr. Beim completed a Physician's Supplemental Report covering services since

22   August 28, 2000, and noted that Plaintiff could return to regular work on August 28, 2000.

23   (Tr. 111) Dr. Beim wrote that it was "unknown" whether a permanent impairment was

24   anticipated. (Tr. 111)

25       Neil J. Gilman, M.D., saw Plaintiff on September 28, 2000, for a neurologic

26   consultation regarding Plaintiff's complaints of numbness of both hands.  (Tr. 100) Nerve

27   conduction studies showed evidence of a mild bilateral carpal tunnel syndrome, which was

28   Dr. Gilman's diagnostic impression, along with some evidence of ulnar irritation at the right

1   ulnar nerve.  (Tr. 101) Dr. Gilman commented that sometimes after surgery it takes awhile

2   for abnormal electrical studies to normalize.  (Tr. 102) Clinically Plaintiff was doing better

3   but was not back to normal, and Dr. Gilman recommend wearing wrist splints at night and

4   a trial of anti-inflammatory medicines and to continue with her physical therapy.  (Tr. 102)

5   Dr. Gilman opined that these symptoms are probably related to her underlying occupation

6   as a bartender, but also recommended checking for diabetes and hypothyroidism.  (Tr. 102)

7        Gloria Beim, M.D. saw Plaintiff on November 6, 2000, and noted that Plaintiff was

8   slowly improving, but that she might have a cutaneous neuroma on the left scar of her wrist,

9   that the Tinels on the left is quite sensitive and negative on the right, and that she had

10  excellent strength.  (Tr. 106) Dr. Beim's impression was that she was doing better as far as

11  strength, but that she still had symptoms.  (Tr. 106) Dr. Beim recommended blood tests.  (Tr.

12  106)

13       Dr. Beim completed a Physician's Supplemental Report covering services since

14  November 6, 2000, and noted that Plaintiff could return to regular work on November 6,

15  2000.  (Tr. 107)  Dr. Beim wrote that it was "unknown" whether a permanent impairment

16  was anticipated.  (Tr.  107)

17       Ronald J. Swarsen, M.D., L.L.C., with Colorado Occupational Healthcare, performed

18  an Independent Medical Examination on January 10, 2002.  (Tr. 153) Plaintiff's chief

19  complaints at the time of the exam were that the pain in her left shoulder, although less than

20  it was before surgery, was worse than it was before the injury.  (Tr. 164) Additionally, both

21  hands were now worse than they were before surgery.  (Tr. 164)

22       At Plaintiff's right wrist and hand, Dr. Swarsen noted a positive Tinels and median

23  nerve compression, and positive Phalen's.  (Tr. 167) Plaintiff's hand grip was better on the

24  left, but still reduced at 4/5.  (Tr. 167)  Dr. Swarsen noted that there was a question of some

25  atrophy at the thenar eminence, but less so at the hypothenar eminence.  (Tr.  167) Dr.

26  Swarsen also noted decreased pinprick sensation over the first three digits consistent with a

27  median nerve distribution.  (Tr. 167) Range of motion at the wrist and fingers was full.  (Tr.

28  167) Dr. Swarsen noted a mildly positive Tinels at the cubital tunnel.  (Tr. 167)

1   At the left hand and wrist, Dr. Swarsen noted a positive Tinels as well as median
2   nerve compression, and positive Phalen's. (Tr. 167) Grip was 3/5. Dr. Swarsen noted some
3   atrophy at the thenar eminence, and also some, but less so, at the hypothenar eminence. (Tr.
4   167) Dr. Swarsen noted decreased pinprick sensations in much the same distribution as on
5   the right. (Tr. 167) Range of motion at the wrist and fingers was full. (Tr. 168) Light
6   stroking of the skin just medial to the proximal aspect of the surgical scar creates withdrawal
7   and complaints of and severe dysthesias into the palm of the hand. (Tr. 168) Range of
8   motion was clinical near full but was reduced especially in flexion and extension compared
9   to right. (Tr. 168) Again, mildly positive Tinels at the cubital tunnel. (Tr. 168)

10   Plaintiff had full range of motion of the left shoulder, although there was some
11   limitation of internal rotation. (Tr. 168)   Palpation produced some tenderness in the
12   glenohumeral joint, and crepitus on all motion of the glenohumeral joint. (Tr. 168) The left
13   trapezius and subscapularis were mildy tender to palpation. (Tr. 168) Impingement signs
14   were negative. (Tr. 168) There was fairly good rotator cuff strength and stability, but
15   definitely reduced in flexion and abduction against resistance compared to the right. (Tr.
16   168)

17   Dr. Swarsen assessed Plaintiff with 1) Impingement, left shoulder; 2) Labral fraying,
18   left shoulder; 3) SLAP lesion, left shoulder; 4) Type III Acromion, left shoulder; 5) Carpal
19   tunnel syndrome, right; 6) Carpal tunnel syndrome, left; 7) S/P bilateral carpal tunnel
20   decompression, failed; 8) S/P decompression, debridement of labral fraying; 9) Neuritis, left
21   palmar superficial sensory branch. (Tr. 169)

22   Dr. Swarsen recommended that Plaintiff be able to return to modified duty in the light
23   work category with some additional limitations that she should not be involved in any
24   repetitive use of either upper extremity, including but not limited to pinching, gripping,
25   reaching away from the body or overhead for any sustained periods of time other than on an
26   occasional basis and with negligible weight (less than five pounds). (Tr. 172) Furthermore,
27   Dr. Swarsen recommended the use of wrist splints at night and during work and elbow splints
28   at night. (Tr. 172)

1    Plaintiff was seen by Dan Guttmann, M.D., on November 23, 2002, for an
2    Independent Medical Evaluation.    (Tr. 306-07) Dr. Guttmann assessed Plaintiff with
3    recurrent left shoulder impingement with recurrent bilateral carpal tunnel syndrome with
4    hypersensitivity of the let wrist. (Tr. 307) Dr. Guttmann also opined that Plaintiff may have
5    developed some reflex sympathetic dystrophy, and/or neuritis of the left palmar superficial
6    sensory nerve of the median nerve.    Plaintiff may also have some Guyon's canal syndrome
7    on the left, possibly on the right.    (tr. 07) Dr. Guttmann stated that, regarding her recurrent
8    carpal tunnel syndrome, this may be secondary to incomplete release and/or long term
9    repetitive use of the upper extremities.    Dr. Guttmann further states that Plaintiff would
10   benefit from a re-evaluation with a nerve conduction study and/or EMGs possibly an MRI
11   of the left shoulder to make sure that there is no problem regarding the rotator cuff or
12   glenohumeral joint and labrum.    Dr. Guttmann thought the Plaintiff could return to work
13   capacity of light work exerting up to 10 to 20 pounds of force occasionally, 5 to 10 pounds
14   of force frequently.    (Tr. 307)
15       David J. Conyers, J.D., of Hand Specialists, P.C. in Colorado evaluated Plaintiff on
16   February 6, 2003.    (Tr. 308) Plaintiff's examination revealed significant limitation of neck
17   range of motion in extension, rotation to the left, and tilting bilaterally.    She had a very
18   positive Wright's test with onset of arm and hand numbness.    She has tenderness over
19   median, ulnar, and radial nerves at the proximal forearm and elbow.    The radial nerve on the
20   left side on Tinels testing gives tingling into the dorsum of the hand.    The ulnar nerve on the
21   right side was dislocating over the medial epicondyle. (Tr. 309) The Plaintiff had a positive
22   Tinels at both wrists, more so the left than the right, she had exquisite neuroma-like pain over
23   the proximal incision on the left side, with good thenar strength bilaterally, good wrist
24   strength, full range of motion fo wrist and fingers and forearm.    (Tr. 309)
25       Dr. Conyers remarked that Plaintiff appeared to have median, ulnar, and radial nerve
26   irritation in both upper extremities and a lot of findings coming from the base of the neck.
27   (Tr. 309) He believed that Dr. Swarsen was right that Plaintiff needed a repeat EMG and
28   nerve conduction studies in order to establish a trend, and that her problem was not at the

1    level of the wrist but instead probably a cervical brachial problem and that she needed an

2    MRI of her neck and evaluation by a neurosurgeon.  Dr. Conyers believed that the Plaintiff's

3    work status as per Dr. Swarsen was appropriate.  (Tr. 310)

4           Plaintiff saw David Coburn, M.D., F.C.C.P., for a disability evaluation on September

5    25, 2003.  (Tr. 277) Plaintiff's primary complaints were bilateral carpal tunnel syndrome and

6    shoulder pain.  (Tr. 277) Following a physical exam, Dr. Coburn assessed Plaintiff with 1)

7    Persistent bilateral median nerve impingement symptoms status post carpal tunnel surgery

8    three years ago.  Minimal objective findings of some weakness in the left hand grip and

9    flexion extension of the wrist area.  No objective sensory deficits.; 2) Status post left

10   shoulder surgery for unclear reasons, some bone impingement problem with some decreased

11   range of motion and persistent pain since.; 3) History of peptic ulcer disease.; 4) History of

12   whiplash injury age 18 with some persistent lower cervical spine tenderness and symptoms

13   and sees a chiropractor for this.  (Tr. 278) Dr. Coburn commented that the "patient's work

14   history to date does involve using her hands and she is able to type for only short periods of

15   time and attempted typing in the past.  She is unable to grip, stronger in the left and would

16   have been unable to perform any jobs that would relate to her prior occupation as a bartender

17   and waitress.  Wrist films appear normal."  (Tr. 278)

18          Clare Barnes, a medical consultant for DDS, completed a Physical Functional

19   Capacity Assessment on October 28, 2003.  (Tr. 280-88) Plaintiff was assessed as having the

20   following exertional limitation: Plaintiff could occasionally lift and/or carry 20 pounds, and

21   frequently lift and or carry 10 pounds.  Plaintiff could stand and or walk about 6 hours in an

22   8 hour workday.  Plaintiff's ability to push and or pull was unlimited.  (Tr. 281) The medical

23   consultant cited as evidence in support of her conclusions the fact that Plaintiff had fairly

24   good range of motion of her neck, full range of motion of her shoulder, and that, although

25   Plaintiff says her shoulder pops, a doctor could not feel any crepitus at this time.

26   Furthermore x-rays of her wrists were normal appearing, and Plaintiff had surgery of both

27   her wrists and her shoulder three years ago.  (Tr. 281)

28          The medical consultant noted no postural limitations, no manipulative limitations

1  other than limited fine fingering manipulation, no visual or communicative limitations, and

2  no environmental limitations other than avoidance of concentrated exposure to extreme cold.

3  (Tr. 284-85)

4         Plaintiff was seen in the Chiricahua Community Health Centers by Lanaya Turner,

5  FNP-C, for a consult regarding hormones.  (Tr. 300) Plaintiff stated that "she just doesn't

6  quite feel right."  (Tr. 300) Turner assessed her with hot flashes, insomnia, muscle pains,

7  generalized, and fatigue.  (Tr. 300)

8         Plaintiff to see Lanaya Turner for follow up of lab work on September 13, 2004.  (Tr.

9  296) Plaintiff also complained of generalized muscle weakness particularly in the lower

10  arms, and a sensation of burning hin her lower arms and thighs.  (Tr. 296) Plaintiff was

11  referred to be evaluated by Dr. Cary, and was started on Trazodone.  (Tr. 297)

12         Guy C. Cary III, M.D. completed a comprehensive consultation of Plaintiff on

13  September 28, 2004.  (Tr. 302-05) Dr. Cary's impression was 1) Bilateral carpal tunnel

14  syndrome; 2) Irritative cervical/lumbar radiculopathies; and 3) Fibromyalgia.  (Tr. 305)

15         Plaintiff was seen by Ulker Tok, M.D., F.A.C.R., on November 18, 2004, for

16  treatment of musculoskeletal pain.  (Tr. 294)  Plaintiff's chief complaint was neck pain and

17  bilateral arm numbness.  (Tr. 294) Dr. Tok completed a physical examination of Plaintiff,

18  noting painful maximal internal rotation in the left shoulder with mild impingement.  (Tr.

19  295) Dr. Tok also noted tenderness of the bilateral trapezial areas, lumbar paravertebral

20  muscles, bilateral epicondyles, medial knees, and lateral hips.  (Tr. 295) There was no

21  tenderness involving the forearms, and strength was normal in the upper extremities, with no

22  muscle atrophy or focal neurologic deficit. (Tr. 295)  Dr. Tok's impression was 1) Chronic

23  myofascial neck and lower back pain, mechanical in nature, and 2) Symptoms of bilateral

24  arm numbness, status-post failed carpal tunnel release.  (Tr. 295)

25  D.    The Commissioner's Decision

26         On January 25, 2006, the ALJ made the following findings:

27         1.    The claimant meets the nondisability requirements for a period of disability
              and Disability Insurance Benefits set forth in section 216(i) of the Social
28            Security Act and is insured for benefits through the date of this decision.

- 15 -

2.      The claimant has not engaged in substantial gainful since the alleged onset of disability.

3.      The claimant's left shoulder disorders[1] is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4.      This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The [ALJ] finds the claimant's allegations regarding her limitations, as well as her witnesses, are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity for a full range of light work.

7.      The claimant's past relevant work as a bartender or waitress did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.      The claimant's medically determinable left shoulder disorder does not prevent the claimant from performing her past relevant work.

9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(Tr. 23-24)

The ALJ noted that Plaintiff established that Plaintiff's other medical complaints, such as fibromyalgia, and cervical and lumbar spine disorders, had not been documented with objective medical signs and diagnostic findings to establish the existence of enduring medical impairments and the evidence did not establish that they significantly compromised the Plaintiff's residual functional capacity.  (Tr. 19) The ALJ found that there was no valid diagnosis of fibromyalgia and that this alleged disorder did not cause more than minimal limitations of her ability to perform basic work-related activities, and was therefore not a "severe" impairment under the Act and Regulations.  (Tr. 20) The ALJ further concluded after reviewing the record that the Plaintiff's neck and back problems do not cause more than

---

[1]  This Court concludes that is a typographical error that the ALJ did not include carpal tunnel syndrom in sentence 3 of the factual findings.  The ALJ probably intended to include Plaintiff's bilateral carpal tunnel syndrome in this section of the findings.  Such intention is evident from the ALJ's conclusion in the body of the discussion that Plaintiff has carpal tunnel syndrome, "severe," as indicated on page 6 of the ALJ's report (Tr. 19), as well as the ALJ's use of the plural "disorders" in sentence 3 of the factual findings.  (Tr. 23)

minimal limitations of her ability to perform basic work related activities, and therefore are not "severe" impairments under the Act and Regulations. (Tr. 20)  The ALJ found that the Plaintiff's complaints of disabling pain not fully credible. (Tr. 21.)  The ALJ noted that the medical records failed to reveal the type of significant clinical and laboratory abnormalities one would expect if the Plaintiff were, in fact, disabled. (Tr. 21) The ALJ further noted that Plaintiff was not interested in conventional medications (she preferred her herbal remedies) or diagnostic imaging such as x-rays, MRIs, or nerve conduction testing, which suggested that her symptoms might not be as serious as she had alleged. (Tr. 21)  Additionally, the ALJ noted that Dr. Biem indicated that Plaintiff could return to modified work on March 6, 2000, that Dr. Swarsen indicated that the Plaintiff could return to light duty but no repetitive use of either upper extremity, and that Dr. Buttmann did not indicate that the Plaintiff should avoid repetitive use of the upper extremities but felt she could return to light work exerting up to 10 to 20 pounds of force occasionally, and 5 to 10 pounds occasionally.  (Tr. 22) Additionally, the ALJ noted that Plaintiff's shoulder impairment is on her non-dominant side, which minimizes her limitations, and, furthermore, during the hearing, Plaintiff "talked with her hands" and gestured extensively.  (Tr. 22)

The ALJ found Plaintiff capable of performing the full range of light work.  (Tr. 22) Relying on the testimony of the vocational expert, the ALJ further found that Plaintiff's past relevant work as a bartender and waitress are light in exertion and semiskilled.  (Tr 22) Accordingly, the ALJ found that the Plaintiff retained the residual functional capacity to perform her past relevant work as a bartender and waitress as actually performed and generally performed in the national economy, and, therefore, was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision. (Tr. 23)

E.    Additional Evidence Presented to the Appeals Council

Following the adverse decision by the ALJ, the Plaintiff submitted a letter indicating that she wished to present additional evidence to the Appeals Council, however, no further additional evidence was submitted.  (Tr. 9, 312)

1    **III.    ISSUES**

2    A.    Plaintiff's Position

3          Plaintiff asserts that the ALJ erred by applying the incorrect legal standards, and that

4    the ALJ's conclusions are not supported by substantial evidence.  Plaintiff also asserts that

5    the ALJ improperly evaluated the opinion of Dr. Swarsen and other physicians, and failed

6    to consider all of Plaintiff's impairments in combination.  Plaintiff also contends that the ALJ

7    improperly assessed the credibility of Plaintiff.  Plaintiff also alleges that the ALJ failed to

8    properly develop evidence as to whether Plaintiff suffered from fibromyalgia, and failed to

9    consider or evaluate the cross examination of the vocational expert.  Finally, Plaintiff argues

10   that the ALJ applied an improper definition of disability in determining whether Plaintiff was

11   entitled to social security disability benefits.

12   B.    Defendant's Position

13         Defendant contends that the ALJ did not commit error as asserted by Plaintiff; and

14   that the general issue is whether the Commissioners's final decision was supported by

15   substantial evidence and free of reversible legal error.

16   **IV.    DISCUSSION**

17   A.    Standard of Review

18         An individual is entitled to Title II Social Security Disability Insurance benefits

19   ("SSDIB") if the individual is insured for those benefits, has not attained retirement age, has

20   applied for those benefits, and is disabled.   42 U.S.C. § 423(a)(1).   The definition of

21   disability is the "inability to engage in any substantial gainful activity by reason of any

22   medically determinable physical or mental impairment which can be expected to result in

23   death or which has lasted or can be expected to last for a continuous period of not less than

24   12 months."  42 U.S.C. § 423(d)(1)(A).

25         The Ninth Circuit has stated that "'a claimant will be found disabled only if the

26   impairment is so severe that, considering age, education, and work experience, that person

27   cannot engage in any other kind of substantial gainful work which exists in the national

28   economy.'"  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan*,

1  900 F.2d 172, 174 (9th Cir. 1990)).

2  The Commissioner, not the court, is charged with the duty to weigh the evidence,

3  resolve material conflicts in the evidence and determine the case accordingly.  Reviewing

4  courts must consider the evidence that supports as well as detracts from the examiner's

5  conclusion.  *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).  Moreover, "if the

6  evidence can support either outcome, the court may not substitute its judgment for that of the

7  ALJ."  *Matney v. Sullivan*, 981 F.2d 1016,1019 (9th Cir. 1992).

8  Disability claims are evaluated pursuant to a five-step sequential process.  20 C.F.R.

9  §§404.1520, 416.920; *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step

10  requires a determination of whether the claimant is engaged in substantial gainful activity.

11  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act

12  and benefits are denied.  *Id*.  If the claimant is not engaged in substantial gainful activity, the

13  ALJ then proceeds to step two which requires a determination of whether the claimant has

14  a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c),

15  416.920(c).  In making a determination at step two, the ALJ uses medical evidence to

16  consider whether the claimant's impairment more than minimally limits or restricts the

17  claimant's physical or mental ability to do basic work activities.  *Id*.  If the ALJ concludes

18  that the impairment is not severe, the claim is denied.  *Id*.  Upon a finding of severity, the

19  ALJ proceeds to step three which requires a determination of whether the impairment meets

20  or equals one of several listed impairments that the Commissioner acknowledges are so

21  severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20

22  C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the

23  listed impairments, then the claimant is presumed to be disabled and no further inquiry is

24  necessary.  If a decision cannot be made based on the claimant's then current work activity

25  or on medical facts alone because the claimant's impairment does not meet or equal a listed

26  impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ

27  to consider whether the claimant has sufficient residual functional capacity ("RFC") to

28  perform past work.   20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the

1   claimant has RFC to perform past work, then the claim is denied.   *Id*.  However, if the

2   claimant cannot perform any past work due to a severe impairment, then the ALJ must move

3   to the fifth step, which requires consideration of the claimant's RFC to perform other

4   substantial gainful work in the national economy in view of claimant's age, education, and

5   work experience. 20 C.F.R. §§ 404.1520(f). 416.920(f).  At step five, in determining whether

6   the claimant retained the ability to perform other work, the ALJ may refer to Medical

7   Vocational Guidelines ("grids") promulgated by the SSA. *Desrosiers*, 846 F.2d at 576-577.

8   The grids are a valid basis for denying claims where they accurately describe the claimant's

9   abilities and limitations. *Heckler v. Campbell*, 461 U.S. 458, 462, n.5 (1983).  However,

10  because the grids are based on exertional or strength factors, where the claimant has

11  significant nonexertional limitations, the grids do not apply. *Penny*, 2 F.3d at 958-959;

12  *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ

13  must use a vocational expert in making a determination at step five. *Desrosiers*, 846 F.2d

14  at 580.

15      A denial of Social Security benefits will be set aside if the Commissioner fails to

16  apply proper legal standards in weighing the evidence even though the findings may be

17  supported by substantial evidence. *Winans v. Bowen*, 853 F.2d 643, 644 (9th Cir. 1987).

18  When the ALJ has applied an incorrect legal standard in reaching a decision, we must

19  remand unless, as a matter of law, the result could not be affected. *See NLRB v. Enterprise*

20  *Assoc.*, 429 U.S. 507, 522 n.9 (1977); *Sagebrush Rebellion, Inc. V. Hodel*, 790 F.2d 760, 765

21  (9th Cir. 1986) (agency may rely on harmless error rule only when its mistake had no bearing

22  on the substance of the decision).  Because Plaintiff's case was decided by an ALJ sitting in

23  a judicial district in the Tenth Circuit Court of Appeals, however, this Court must address one

24  further issue. Plaintiff argues that the ALJ erred in not properly evaluating Plaintiff's claims

25  under the standards articulated by Tenth Circuit.  The Government counters, urging this

26  Court to apply the standards set forth by the Ninth Circuit.

27      It is no straight-forward matter.  The Social Security Administration followed a

28  "nonacquiescence" policy for a number of years; an administrative pronouncement that the

agency would not follow a judicial decision except in that particular case.  The legal significance of this is that an ALJ would not necessarily be bound by circuit law, but rather by national policy in reaching his or her decision.  Thus, it would matter little under which circuits's law that decision was reviewed.  While scholarly arguments can be made in favor of such a policy, such as the necessity of a nonacquiescence policy to prevent the courts from arrogating power delegated to the agencies by Congress and that such policy is necessary to a national policy; the Ninth Circuit expressed its strong displeasure with the nonacquiescence policy.  *See Lopez v. Heckler*, 713 F.2d 1432, (9th Cir. 1983).  Further, the Ninth Circuit has held that a federal agency is obligated to follow circuit precedent in cases originating in that circuit.  *Singh v. Ilchert*, 63 F.3d 1501, 1508 (9th Cir. 1995).

The Social Security Administration ("SSA") has since issued regulations which require that the SSA apply a Circuit Court of Appeals decision which the SSA has determined to be in conflict with the SSA's interpretation of the Social Security Act or regulations, unless the Commissioner seeks further review of the decision or relitigates the issue presented in the decision.  20 C.F.R. § 404.985(a); 20 C.F.R. § 416.1485(a).  The decision is applied within the applicable circuit to claims at all levels.  Unless and until a Social Security Acquiescence Ruling (AR) is issued determining that a final circuit court holding conflicts with the Agency's interpretation of the Social Security Act or regulations and explaining how SSA will apply such a holding, SSA decisionmakers continue to be bound by SSA's nationwide policy, rather than the court's holding, in adjudicating other claims within that circuit court's jurisdiction.  SSR 96-1p (61 Fed Reg 34470 (7/2/96)).

The parties have cited no social security cases involving resolution of conflicts between the rules of different circuits.  Plaintiff's claim arose in the Tenth Circuit, and was heard by an ALJ who, under the acquiescence rules cited above, may or may not have had reason to apply Tenth Circuit law, but certainly would have had no reason to reach outside his locale and apply Ninth Circuit law.  It would have been improper for him to do so.  It seems that the better rule would be to follow the law of the circuit in which the ALJ conducts the hearing, in this case the Tenth Circuit.  Such a rule would allow an ALJ to look to a

single circuit's caselaw for controlling guidance and would, additionally, discourage forum shopping by claimant's. Accordingly, this Court will review the ALJ's decision to determine if the ALJ properly evaluated Plaintiff's claims under the standards articulated by Tenth Circuit

B.    Analysis - Determination of Residual Functional Capacity

       *1.    Did the ALJ apply the correct legal standards?*

       A District Court reviewing the decision of the Secretary is bound by the findings of fact if they are supported by substantial evidence. *Byron v. Heckler*, 742 F.2d 1232, 1234 (10th Cir. 1984). This deferential standard of review applies only to findings of fact, and it is well established in the Tenth Circuit that "[f]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Id*. at 1235. (*quoting Smith v. Heckler*, 707 F.2d 1284 (11th Cir.1983)).

       Plaintiff argues that she presented evidence and testimony regarding subjective impairments, and that these subjective complaints were not properly evaluated as potentially debilitating impairments and an incorrect legal standard was applied. Plaintiff asserts that the ALJ dismissed Plaintiff's subjective complaints of pain in her right hand and wrist, left hand and wrist, left shoulder, low back and cervical spine, without conducting the appropriate legal analysis required under *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).

       A pain-producing impairment, whether psychological or physiological in origin, must be proven by objective medical evidence before an agency decision maker can find a claimant disabled by pain. *Luna*, 834 F.2d at 163. *Accord Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986). If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. *Luna*, 834 F.2d at 163. At this stage, considerations of credibility are not determinative. *Id*. If the nexus between impairment and pain alleged is insufficient, the claimant cannot receive benefits based upon disabling pain. *Id*. at 163. If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to

1    determine whether the claimant's pain is in fact disabling. *Id.* at 163. If an impairment is

2    reasonably expected to produce some pain, allegations of disabling pain or severe pain

3    emanating from that impairment are sufficiently consistent to require consideration of all

4    relevant evidence. *Id.* at 164. This evidence includes the medical data previously presented,

5    any other objective indications of the degree of the pain, and subjective accounts of the

6    severity of the claimant's pain. *Id.* at 163. Only at this point may the decision maker decide

7    whether he believes the claimant's assertions of severe pain. *Id.* at 163. The absence of an

8    objective medical basis for the degree of severity of pain may affect the weight to be given

9    to the claimant's subjective allegations of pain, but a lack of objective corroboration of the

10   pain's severity cannot justify disregarding those allegations. *Id.* at 165.

11           Defendant concedes that Plaintiff had established medically determinable impairments

12   consisting of left shoulder impairment and carpal tunnel syndrome. (Doc. 27, p. 5; see TR

13   at 19). Plaintiff asserts that there was a "loose nexus" between Plaintiff's complaints of pain

14   and loss of function in her right/dominant wrist and hand, left wrist and hand, left shoulder,

15   low back and cervical spine and the opinions of Dr. Ronald J. Swarsen, Dr. Neal J. Gilman,

16   Dr. Gloria Beim, Dr. David A. Coburn, Dr. Ulker Tok, Lanaya Turner FNP-C, Dr. Guy C.

17   Cary, Dr. Dan Guttmann, Dr. David J. Conyers and Sandra Moore Dipl.Ac.L.Ac. Defendant

18   states that the ALJ found no objective medical evidence of neck and low back pain, and that

19   Plaintiff's complaints of such were not supported by objective medical signs and diagnostic

20   findings.

21           a.      *Objective Evidence of Pain*

22           To the extent that the ALJ first made a determination that there was objective medical

23   evidence of an impairment that would produce pain in Plaintiff's left shoulder and in her

24   wrists, and no objective medical evidence of an impairment that would produce pain in

25   Plaintiff's neck and low back pain, the ALJ applied the correct legal standard set forth in

26   *Luna, supra.*

27           b.      *Nexus*

28           Having found some objective evidence of a pain-producing impairment, the ALJ was

- 23 -

1    then required to consider the relationship between the impairment and the pain alleged.  In

2    other words, if the impairment is reasonably expected to produce some pain, allegations of

3    disabling pain emanating from that impairment are sufficiently consistent to require

4    consideration of all relevant evidence.  *Luna*, 834 F.2d at 164.

5        The ALJ made no attempt to determine whether there was a "loose nexus" between

6    the proven impairment and the Plaintiff's subjective allegations of pain.  *See Luna*, 834 F.2d

7    at 163-64.  The ALJ stated in his decision that "the claimant's impairments cause her some

8    discomfort and pain; however, the law is clear that "disability" requires more than the mere

9    inability to work without pain."  (Tr. at 21) Contrary to *Luna's* admonitions, the ALJ made

10   no attempt to determine if there was any nexus between Plaintiff's impairments, carpal tunnel

11   syndrome, and left shoulder pain, and Plaintiff's subjective complaints of disabling pain.  In

12   fact, the ALJ concluded, without discussion of any of Plaintiff's complaints of disabling pain,

13   that pain, by itself, could not be disabling.  (Tr. at 21)

14       The ALJ dismissed Plaintiff's complaints of disabling pain associated with her

15   impairments by inappropriately citing only to the first part of an otherwise appropriate legal

16   analysis.  In the Tenth Circuit, disability requires more than the mere inability to work

17   without pain; pain which is so severe, however, either by itself, or in conjunction with other

18   impairments, so as to preclude substantial gainful employment, is disabling.  *Brown v.*

19   *Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1988) (*citing Dumas v. Schweiker*, 712 F.2d 1545,

20   1552 (2nd Cir. 1983).  The nexus between the impairment and the subjective complaints can

21   be loose. *Luna*, 834 F.2d at 165.  "[I]f an impairment is reasonably expected to produce *some*

22   pain, allegations of *disabling* pain" are sufficiently consistent to satisfy this step.  *Id*. at 164

23   (emphasis in original).  The ALJ, by citing only to a portion of the legal standard, completely

24   discounted even the possibility of disabling pain prior to considering all the relevant

25   evidence. The ALJ, therefore, did not consider all the relevant evidence, including Plaintiff's

26   specific subjective complaints from her testimony as well as the testimony from lay witnesses

27   Mr. Gonzales and Ms. McCoy.  Although it may be difficult to establish disabling pain

28   without the explicit confirmation of a treating physician, the Plaintiff is entitled to have her

1   nonmedical objective and subjective testimony of pain evaluated by the ALJ and weighed

2   alongside the medical evidence.  *Huston v. Bowen*  838 F.2d 1125, 1131 (10th Cir. 1988).

3   The ALJ may not ignore the evidence and make no findings.  *Id*.

4          The record contains evidence that the Plaintiff's pain constituted an impairment

5   sufficient to preclude the Plaintiff from any substantial gainful employment on a sustained

6   basis. Although the medical evidence alone may be insufficient to establish the disabling

7   character of the Plaintiff's pain, if the nonmedical evidence of pain is credible, it would

8   preclude the mechanical application of the grids and, in this situation, would seem to dictate

9   a finding of disabling pain when combined with the medical evidence. If, on the other hand,

10  the nonmedical evidence is contradicted by the medical evidence or is otherwise not credible,

11  then the ALJ would have reason to apply the grids.

12         Because the ALJ did ignore the evidence of disability, contrary to *Luna*, and therefore

13  failed to consider all the relevant evidence, the Magistrate Judge recommends that the

14  District Judge reverse the decision that plaintiff is not disabled.

15         2.      *Did the ALJ err in analyzing Plaintiff's credibility?*

16                 a.      *Consideration of Subjective Evidence*

17         The Plaintiff asserts that the ALJ erred in failing to properly assess her credibility

18  under *Huston*, 838 F.2d at 1133, which requires credibility determinations to be closely and

19  affirmatively linked to substantial evidence.  Plaintiff asserts that the ALJ erred by

20  completely ignoring the fact that Plaintiff worked without interruption for fifteen years prior

21  to leaving work; that Plaintiff worked while suffering from significant well-documented pain

22  in her cervical spine, low back and hands for several years prior to leaving work; and that

23  Plaintiff was candid regarding her income from occasional Tarot card readings.  Plaintiff

24  argues that beyond stating that Mannella "talked with her hands" the ALJ did not make

25  specific findings regarding why he did not believe Plaintiff's allegations of disability, nor

26  make any meaningful attempt to evaluate the testimony of Plaintiff, her companion Juan

27  Gonzalez, and her friend, Jan McCoy regarding her ability to work.

28         At the third step in analyzing a claimant's allegations of disabling pain, the ALJ

1    considers all the medical data, any objective indications of pain, and the subjective accounts

2    of the severity of the pain.  At this point, the decision maker may assess the claimant's

3    credibility.  *Luna*, 834 F.2d at 163.

4        In deciding whether to believe a claimant's assertions of disabling pain, there are

5    "certain factors an [ALJ] should take into consideration when considering the credibility of

6    pain testimony." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir.1991)(*citing Huston*, 838

7    F.2d 1125).  "Some of the possible factors include: the levels of medication and their

8    effectiveness, the extensiveness of attempts (medical or nonmedical) to obtain relief, the

9    frequency of medical contacts, the nature of daily activities, subjective measures of

10    credibility that are peculiarly within the judgment of the ALJ, the motivation of and

11    relationship between the claimant and other witnesses, and the consistency or compatibility

12    of nonmedical testimony with objective medical evidence."  *Huston,* 838 F.2d at 1132.

13    Persistent attempts to find relief from pain, use of pain medications, and the possibility of

14    psychological disorder that combine with physical problems are all relevant indicators of

15    pain. *Williams v. Bowen,* 844 F.2d 748, 754 (10th Cir. 1988).  "Once an objective medical

16    basis for the existence of pain has been shown, subjective evidence must be given at least

17    some weight and cannot be disregarded or minimized into nonexistence." *Williams*, 844 F.2d

18    at 754.  "Indeed, 'the severity of pain is inherently subjective.... If objective medical evidence

19    must establish that severe pain exists, subjective testimony serves no purpose at all.'" *Id*.

20    (*quoting Luna v. Bowen*, 834 F.2d at 165.)

21        In this case, the ALJ found the Plaintiff's complaints of pain not fully credible based

22    on consideration of "the lack of significant findings by the physicians." (TR at 21.) The ALJ

23    noted, in rejecting Plaintiff's credibility, that "the medical records fail to reveal the type of

24    significant clinical and laboratory abnormalities one would expect if the claimant were, in

25    fact, disabled."  (TR at 21) The ALJ further noted that, although the record showed some

26    restrictions by physicians, none of these restrictions precluded all work activity.  (TR at 22)

27    Beyond that, the ALJ noted that Plaintiff was not interested in conventional medications, or

28    diagnostic imaging, and that at the hearing the ALJ observed the claimant talking with her

hands and gesturing extensively using her hands, wrists and arms throughout the hearing. (TR at 22)

As noted above, the ALJ failed to consider all the relevant evidence in making a determination if Plaintiff's impairments can support a disability claim based on pain, and on that basis alone the decision should be reversed. The ALJ further erred, however, in rejecting Plaintiff's credibility based primarily on a lack of significant medical findings, having already determined that Plaintiff had severe impairments. Furthermore, the ALJ did not discuss the extensiveness of attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, or the nature of Plaintiff's daily activities. In fact, despite Plaintiff's aversion to conventional medicine, she had attempted three surgeries to obtain relief from her conditions. Plaintiff testified that she took Ibuprofen and Darvocet for pain. (Tr. 338) That she also tries herbal remedies because she hasn't had good luck with traditional medicine. (Tr. 338) She was prescribed antidepressants, but didn't like the way they made her feel, although she occasionally did take Xanax. (Tr. 339) All of this testimony was relevant to the ALJ's determination of Plaintiff's credibility but was not discussed.

Furthermore, the ALJ's decision was not supported by substantial evidence. Dr. Sherman conducted physical testing and x-rays of Plaintiffs shoulder. (Tr. 89) Dr. Gilman performed nerve conduction studies which showed evidence of a mild bilateral carpal tunnel syndrome. (Tr. 101) Dr. Beim noted that Plaintiff did take Ibuprofen, but that she was still in a lot of pain. (Tr. 143)

Because the ALJ erred in assessing Plaintiff's credibility, the Magistrate Judge recommends that the District Judge reverse the decision that plaintiff is not disabled.

          *3.     Did the ALJ err in rejecting the opinions of Dr. Swarsen, Dr. Cobrun, and Dr. Conyer?*

Plaintiff contends that the ALJ failed to evaluate or discuss in a meaningful fashion either Dr. Swarsen's "huge rating" of 46% overall whole person impairment or the process of evaluation that led to the ALJ's opinion. In commenting on Dr. Swarsen's opinion, the ALJ noted that Dr. Swarsen stated in January of 2002 that the claimant could return to light

1   work, but no repetitive use of the upper extremities, and that "[t]hese restrictions do not

2   preclude all work activity. (Tr. 20) Further, because of Plaintiff's complaints, Dr. Swarsen

3   recommended the use of wrist and elbow splints at night only. (Tr. 20) Plaintiff relied on this

4   evidence to bolster his conclusion that Plaintiff's bilateral carpal tunnel syndrome did not

5   prevent all work activity. (Tr. 20)

6        The ALJ again considered Dr. Swarsen's opinion when considering Plaintiff's

7   credibility. (Tr. 21) Only then did he acknowledge Dr. Swarsen's impairment rating, giving

8   it apparently little weight however, as the ALJ again focused on Dr. Swarsen's opinion,

9   without further discussion, that Plaintiff continued to function. (Tr. 21) The ALJ noted some

10  restrictions by physicians, including an indication by Dr. Swarsen that Plaintiff could return

11  to light duty work, with no repetitive use of either upper extremity, but again, noted that she

12  continued to function. (Tr. 22)

13       Although the ALJ did not provide reasons for discrediting Dr. Swarsen's opinion, it

14  is clear that, by focusing only on the statement that "Plaintiff continues to function" that the

15  ALJ did, in fact, disregard the complete opinion of Dr. Swarsen. Dr. Swarsen explained his

16  overall whole person impairment rating of 46% as follows:

17       ...clearly this is a huge rating and Ms. Mannella does continue to function.

18       However, she does not function near the level that she did previously which

19       when combined with her persistent symptoms, persistent bilateral carpal tunnel

20       syndrome with failed surgical intervention, it is my opinion that realistically

21       she does have significant impairment effecting the use of both of her upper

22       extremities which *significantly impacts her activities of daily living*.

23  (Tr. 173) (emphasis added)

24       Ironically, the ALJ relied on Dr. Swarsen's opinion to find Plaintiff not fully credibly,

25  as noted above. (Tr. 21)

26       Furthermore, in assessing Plaintiff's residual functional capacity, the ALJ relied on

27  Dr. Swarsen's opinion, in part to determine that Plaintiff was capable of performing the full

28  range of light work. (Tr. 23) Dr. Swarsen, however, had opined that Plaintiff was able to

1    return to work in the light work category with modifications as follows:

2          ...**she should not be involved in any repetitive use of either upper**

3          **extremity**, including but not limited to pinching, gripping, reaching away from

4          the body or overhead for any sustained periods of time other than on an

5          occasional basis and with negligible weight (less than 5#)   Furthermore, she

6          should: Use wrist splints at night and during work, however, I would suggest

7          a small, bowling-type splint for daytime use.  Use elbow splints at night.

8    (Tr. 172) (emphasis in original)

9          Absent an indication that an examining physician presented "the only medical

10   evidence submitted pertaining to the relevant time period," the opinion of an examining

11   physician who only saw the claimant once is not entitled to the sort of deferential treatment

12   accorded to a treating physician's opinion." *Doyal v. Barnhart*, 331 758, 763 (10th Cir. 2003)

13   (citing *Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995)).  An ALJ, however, must evaluate

14   every medical opinion in the record, and may not "pick and choose" portions of a physician's

15   medical opinion which are favorable to the ALJ's decision.  *Hamlin v. Barnhart*, 365 F.3d

16   1208, 1215 (10th Cir. 2004); 20 C.F.R. § 404.1527(d).  The ALJ did not independently

17   evaluate Dr. Swarsen's opinion, but, because he concluded that Plaintiff retained the ability

18   to perform the full range of light work, implicitly rejected Dr. Swarsen's opinion that

19   Plaintiff could only perform light work with limitations.  This abstraction of pieces of

20   evidence favorable to the ALJ's non-disability decision without a meaningful and thorough

21   evaluation of the evidence cannot support the ALJ's conclusion.  "[W]hen, as here, an ALJ

22   does not provide any explanation for rejecting medical evidence, we cannot meaningfully

23   review the ALJ's determination."  *Drapeau v. Massanari*  255 F.3d 1211, 1214 (10th Cir.

24   2001).

25         Because the ALJ erred in evaluating Dr. Swarsen's opinion, the Magistrate Judge

26   recommends that the District Judge reverse the decision that plaintiff is not disabled.

27

28

1

**V.    RECOMMENDATION**

The Magistrate Judge finds that the ALJ erred at step four of the five step disability analysis by improperly analyzing the severity of Plaintiff's pain as well as her credibility. Additionally, the ALJ erred at step four in evaluating the opinion of Dr. Swarsen, who concluded that Plaintiff could perform light work only with restrictions. Because additional proceedings will now ensue at step four, it is unnecessary to reach plaintiff's further alleged errors.

For the foregoing reasons, it is the recommendation of this Court that the District Judge, after his independent review and consideration, enter an Order **GRANTING** Plaintiff's Motion for Summary Judgment (Doc. No. 20), **DENYING** Defendant's Cross-Motion for Summary Judgment (Doc. No. 26), and **REMAND** this case for further consideration.

Pursuant to Title 28 U.S.C. § 636(b), any party may serve and file written objections within 10 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number: CV 06-469-TUC-CKJ.

DATED this 20th day of February, 2008.


_____
Bernardo P. Velasco
United States Magistrate Judge